```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF GEORGIA
                 COLUMBUS DIVISION
```

| | |
|---|---|
| JOSEPH D. CARMAN, | * |
| Plaintiff, | * |
| vs. | * |
| | CASE NO. 4:18-CV-203 (CDL) |
| CENTRAL OF GEORGIA RAILROAD COMPANY, *et al.*, | * |
| | * |
| Defendants. | * |
| | * |

O R D E R

Joseph D. Carman worked as a conductor for Central of Georgia Railroad Company ("Central"). Carman contends that he suffered an on-the-job injury, and he asserts a personal injury claim against Defendants under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq*. Carman also alleges that he was terminated from his job in retaliation for reporting the on-the-job injury, and he asserts claims against Defendants under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Defendants filed a motion for partial summary judgement, asserting that Carman's FRSA claim fails as a matter of law. As discussed in more detail below, Defendants' partial summary judgment motion (ECF No. 29) is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Carman, the record reveals the following facts.  Carman worked as a conductor for Central out of its Columbus, Georgia terminal.  Central is a subsidiary of Norfolk Southern Railway Company.  In the summer of 2017, Central's mainline traffic in Columbus was shut down, leading to a reduction in available work.  As a result, Carman, was "put out to place," which meant that he lost his job to someone with higher seniority.  On June 21, 2017, Carman made a public post on Facebook that included a screenshot of the Norfolk Southern mainframe system stating that Carman had been displaced from his job by Keiron Mathis, along with the following statement:

2



Brockman Dep. Ex. 24, Facebook Screenshots 23, ECF No. 29-20 at 23. In reply, Mathis commented, "I'm about to say, don't put me out there like dat. Shiiiit, if everyone would've followed my lead I guarantee they wouldn't have furloughed so many. Jimmy Larkin told me 'the 3B March to they own beat'." *Id.* at 27. Carman replied to this comment with: "You know I ain't blaming you, just making jokes." *Id.* Mathis added another comment to the main post: "I stopped off for the duration." *Id.* Sean Penman commented on the main post: "Man, keep ya head up. Until we as a union group stand together and stop making this greedy company record breaking profits we will never accomplish anything. The railroad has gotten smart and pay off the top union men to sell the rest of us out. We can't strike but in my opinion we can all mark off!!!! Bless u bro." *Id.* Mathis replied to Penman's comment, "Exactly." *Id.*

On June 24, 2017, Carman received a text message from a road foreman stating that "out to place" employees in Columbus were being furloughed. Carman enrolled in a three-week commercial driver training course because he believed he no

3

longer had a job at Central and was under the impression that he had at least thirty days before he could be called back to work on the railroad. He began the course on June 26, 2017. On June 29, 2017, Carman made a public Facebook post to announce that he got his CDL permit:



Joseph Carman at opelika Drivers license office.
June 29 · Opelika, AL

Passed Combinations, Air Brakes and General Knowledge first time. Got my CDL permit. In and out, that's how I do it.

*Id.* at 28. Later that day, Central placed Carman on its "extra board," a list of ten employees available to work if the railroad needed to run an extra train or the employee assigned to a job was unavailable. Norfolk Southern prohibits employees from working second jobs that may interfere with their ability to work for the railroad. When the railroad's crew call office calls an employee to work, the employee must take the call if marked up to work and available. If an employee misses the call or "marks off" after the call, he may be subject to disciplinary action. So, to avoid a potential disciplinary action, Carman needed to be available to work for the railroad while he was on the extra board. Carman thus believed he either had to quit the CDL program and return to Central (and lose the $4,000 course fee) or finish the CDL program and resign from Central.

After hearing that he was back on the extra board, Carman added a comment to his earlier post about the CDL permit:



Joseph Carman
And the railroad throws me back on the extra board without telling me anything about it. Seeing what the options are now. May be decision time.
June 29 · Like · Reply · 3

*Id.* at 31. Another conductor, J.T. Williams, replied to this comment saying that the engineer's board had been cut to three; Carman asked if that would push him "right back off," and Williams responded that it was hard to tell. *Id.* Carman replied that he was "waiting for [Assistant Trainmaster Barrette] Miller to get back with [him] about what to do":



Joseph Carman
Yeah I'm waiting for Miller to get back with me about what to do. I have two more weeks of this school. And really don't wanna be working one week and furloughed the next.
June 29 · Like · Reply · 2

*Id.* at 32. Williams posted another comment advising Carman to "mark off sick while on the board or take vacation." *Id.* After more back and forth comments with Williams in which Carman expressed concern that he would not be able to complete his truck driving course, which did not end until July 15, Carman responded:

5


**Joseph Carman**
I'm pretty sure I'm done just gonna let them feel some pain. Before I pull the big pin.
June 30 · Like · Reply · 2

*Id.* at 34. Carman admits that "let them feel some pain" meant that he was not going to take calls from Central to come to work, regardless of the need, and "pull the big pin" means resign. Defs.' Mot. for Summ. J. Attach 6, Investigative Hr'g Tr. 16:6-17:21, 19:17-19, ECF No. 29-6 at 17-18, 20. After Carman made the Facebook comment, he spoke with his wife, "took some breaths, let everything calm down," and decided to go back to work at the railroad. *Id.* at 18:10-21. He worked out an arrangement with his union representative to ensure that he would be able to complete the CDL course without missing any crew calls from Central; the union representative made sure that Carman was covered for any crew calls during the second week of his driving course and allowed Carman to use vacation for the third week of the driving course. Carman Dep. 162:8-163:5, ECF No. 29-2. Carman made a Facebook comment on July 11 that he was going back to the railroad after truck driving school. Facebook Screenshots, ECF No. 29-20 at 15. Carman's next call for a train came on July 17. He did not miss any crew calls after returning to work.

6

On July 24, 2017, Carman was walking on a path of the ballast line next to an industrial lead track when the ballast under his foot slipped.  Carman felt a pop in his right knee, and his right knee buckled.  At the time, Carman did not think the injury was sufficiently serious to report, so he finished his shift and went home.  But when Carman got home, he started to feel pain in his knee.  The next morning, his knee was swollen and it hurt more, so Carman called his supervisor and reported the injury.  The next day, July 26, 2017, Carman met with a railroad claim agent named Ken Conleay to give a recorded statement about his injury.  Defendants presented evidence that as part of his routine investigation, Conleay looked at Carman's publicly available social media, found some Facebook posts and comments by Carman and others referencing Central and its parent company, Norfolk Southern, and suggested that Carman's supervisors look into the posts and comments.  Conleay Decl. ¶¶ 6-8, ECF No. 29-21.  Carman disputes that Conleay discovered the posts on his own; he contends that Norfolk Southern Georgia Division Superintendent Melvin Crawley directed Stacey Mansfield to review Carman's social media, as well as the social media of several other Georgia Division employees who had recently reported on-duty injuries.  See Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 6, Email from M. Crawley to S. Mansfield (July 31, 2017 at 9:55 AM), ECF No. 33-8 at 5 (asking Mansfield to look

for posts about Norfolk Southern by R.S. Corley, J.R. Ring, A.A. Wyche, M. Heath, and J.C. Carman); *see also* Corley Decl. ¶ 4, ECF No. 33-9 (stating that Corley was injured on the job in May 2017); Wyche Decl. ¶ 3, ECF No. 33-10 (stating that Wyche was injured on the job in June 2017); Heath Decl. ¶ 4, ECF No. 33-11 (stating that Heath was injured on the job in July 2017). The implication, Carman asserts, is that Crawley was searching for a plausible basis for disciplining the injured employees.[1] Mansfield did not find any posts about Central or Norfolk Southern, but she did discover several posts Carman made about training to obtain a commercial driver's license.

J.C. Brockman, who was Assistant Division Superintendent for the Georgia Division of Norfolk Southern at the time, also reviewed Carman's social media posts on July 31, 2017. He saw all of the public Facebook posts and comments Carman made in June and July of 2017, including the post and comments about furloughs in Columbus and the post and comments about Carman's truck driving course. Carman disputes that the comments were public because he did not post them directly to his Facebook profile page. Instead, Brockman would have had to click on his

---

[1] It is undisputed that on December 7, 2016, a Georgia Division employee was dismissed for conduct unbecoming an employee in violation of Norfolk Southern's Safety and Conduct General Rule 900 based on the employee's inappropriate Facebook post about Norfolk Southern, which was done while the employee was on the clock, divulged information about the railroad's affairs to unauthorized persons, and threatened the lives of the railroad's dispatchers.

8

original post and scroll through the comments.  Carman does not dispute that the original posts were public or that Brockman was able to access the comments; he admits that the comments were "technically accessible to anyone (and therefore 'public' according to Defendants)."  Pl.'s Resp. to Defs. Statement of Material Facts ¶ 26, ECF No. 33-1.

Brockman interpreted Carman's June 30 comment as meaning that Carman was planning to resign ("pull the big pin") but was planning to let Central "feel some pain" before that by marking off and not working when needed and called.  Brockman Decl. ¶ 24, ECF No. 29-22; Brockman Dep. 121:10-123:19, ECF No. 33-4.  Defendants did not point to any evidence that Carman followed through on this "threat" to make Central "feel some pain," and Brockman himself described it as an "idle threat."[2]  Brockman Dep. 132:2-7.  As discussed above, Carman worked out an arrangement with his union representative so that he could complete his driving course without missing any crew calls, and he did not miss any calls after returning to work.

After reviewing Carman's Facebook posts and comments, Brockman decided to terminate Carman for conduct unbecoming an employee, in violation of Norfolk Southern's Safety and Conduct General Rule 900.  Rule 900 states:

---

[2] Defendants do not appear to argue that Carman's July 24 injury was reported for the purpose of avoiding a call.

9

>Employees are to conduct themselves in a professional manner and not engage in behavior or display material that would be considered offensive or inappropriate by co-workers, customers, or the public. Offensive or inappropriate behavior includes making disparaging remarks, telling jokes or using slurs concerning race, religion, color, national origin, gender, age, veteran status, sexual orientation, disability or any other legally protected status. Offensive or inappropriate material includes that which is sexually explicit or insulting to individuals because of race, religion, color, national origin, gender, age, veteran status, sexual orientation, disability or any other legally protected status.
>
>Upon discovery, offensive or inappropriate material must be removed immediately from Company property by its owner, or if the owner is unknown or fails to remove it, it must be destroyed.

Defs.' Mot. for Summ. J. Attach. 6, Norfolk Southern Safety & Conduct General Rule 900, ECF No. 29-6 at 34. Brockman asserts that he believed Carman's statement that he would 'let them feel some pain" was "disparaging and damaging to Norfolk Southern" and Central and was "threatening to their operations and ability to serve their customers." Brockman Decl. ¶ 9.

On August 4, 2017, Carman was officially charged with conduct unbecoming an employee based on his June 30 Facebook comment, "I'm pretty sure I'm done just gonna let them feel some pain. Before I pull the big pin." Facebook Posts 34. At the investigative hearing, Carman admitted that his "let them feel some pain" quote meant that he was not going to take calls from Central to come to work, regardless of the need. Investigative Hr'g Tr. 16:6-17:21. He further testified that after he made

10

the Facebook comment, he spoke with his wife, "took some breaths, let everything calm down," and decided to go back to work at the railroad. *Id.* at 18:10-21. Carman also offered an apology about the Facebook comment and said he "probably shouldn't have put that out there." *Id.* 23:11-19. By letter dated September 6, 2017, Carman was dismissed from service.[3] Plaintiff unsuccessfully appealed his dismissal internally through all available levels at Central.

## DISCUSSION

The FRSA prohibits railroad carriers and their officers and employees from retaliating against employees for "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). The FRSA incorporates the burden-shifting framework for retaliation claims established in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106–181, § 519, 114 Stat. 61 (2000). *Id.* § 20109(d)(2)(A)(i). Under that framework, the complaining employee must make a prima facie showing that his protected activity "was a contributing factor" in an "unfavorable personnel action" against the employee. 49 U.S.C. § 42121(b)(2)(b)(i)). The complaining employee "need only show that his protected activity 'was a contributing factor' in the

---

[3] Keiron Mathis and J.T. Williams were also charged with a violation of Rule 900 for their Facebook comments, and they were both dismissed from service.

11

retaliatory discharge or discrimination, not the sole or even predominant cause." *Majali v. U.S. Dep't of Labor*, 294 F. App'x 562, 566 (11th Cir. 2008) (per curiam) (quoting 49 U.S.C. § 42121(b)(2)(B)(i), (iii)). So, "if a retaliatory motive 'tends to affect in any way the outcome of the decision' to take an adverse action against an employee, the statutory protections apply." *Id.* (quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008) and *Marano v. Dep't. of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)); *accord* Procedures for the Handling of Retaliation Complaints Under the National Transit Systems Security Act and the Federal Railroad Safety Act, 75 Fed. Reg. 53522-01, 53,524 (Aug. 31, 2010). When Congress adopted the same "contributing factor" language under the Whistleblower Protection Act, it noted that the "contributing factor" test was "specifically intended to overrule" case law that required "a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action." 135 Cong. Rec. 5033 (Mar. 21, 1989) (explanatory statement on S.20).

If the complaining employee makes a prima facie showing that his protected activity was a contributing factor in an unfavorable personnel decision, then his "employer may nonetheless prevail" if it demonstrates by clear and convincing

12

evidence that "the employer would have taken the same unfavorable personnel action in the absence of" the protected activity. *Majali*, 294 F. App'x at 566-67 (quoting 49 U.S.C. §§ 42121(b)(2)(B)(ii), (iv)).

Here, Defendants do not dispute that Carman engaged in protected activity when he reported his injury. Defendants also do not dispute that Carman's discharge was an unfavorable personnel action. Defendants do argue that Carman cannot establish that his protected activity was a contributing factor in his discharge, and they contend that even if Carman could establish a causal connection between his protected activity and his termination, their evidence clearly establishes that Carman would have been terminated anyway. The Court finds that genuine fact disputes exist on these issues, precluding summary judgment.

Defendants began investigating Carman within a week after he reported his injury, then terminated him shortly after that. The Court is satisfied that under the circumstances of this case, a reasonable juror could find that the injury report was a contributing factor in Carman's termination based on the very close temporal proximity between the two events plus the genuinely disputed pretextual nature of the reason given by Defendants for the termination. Although the Eleventh Circuit has not spoken on the question whether a close temporal

13

proximity is enough for an FRSA plaintiff to show that protected activity was a "contributing factor" in an unfavorable personnel action, the Eleventh Circuit has made it clear that a Title VII retaliation plaintiff—who must ultimately prove that protected activity was the but-for cause of an adverse employment action— may establish causation for purposes of a prima facie case by showing a very close temporal proximity between the protected activity and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam); *accord Scott v. Sarasota Doctors Hosp., Inc.*, 688 F. App'x 878, 884 (11th Cir. 2017) (per curiam) (concluding that the Title VII plaintiff had established a prima facie case of retaliation based on the very close temporal proximity between her EEOC charge and her termination); *see also Genberg v. Porter*, 882 F.3d 1249, 1258 (10th Cir. 2018) (finding, in a case under the Sarbanes-Oxley Act's whistleblower protection provision, that very close temporal proximity between protected activity and an adverse employment action was enough to create a genuine fact dispute on "contributing factor"). Since FRSA's "contributing factor" standard is meant to be a more lenient standard than Title VII's "but for" causation standard in retaliation cases, the Court finds that the record viewed in the light most favorable to Carman creates a genuine fact dispute on

14

whether Carman's protected activity was a contributing factor in his termination.

The Court is not persuaded that the rationale of Defendants' out-of-circuit authority applies here; in those cases, the courts concluded that it was clear from the record that the protected activity was not a contributing factor despite temporal proximity. *See Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 644-45 (7th Cir. 2019) (finding that the railroad employee had not established that his injury report was a contributing factor in his termination and concluding that it was clear from the record that the railroad had fired him "because of his long record of disciplinary problems"); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (finding that temporal proximity alone could not establish that a safety report was a contributing factor in an employee's termination because (1) there was no evidence that the decisionmakers knew of the safety report, (2) the employee was on disciplinary probation before he made the report, and (3) the employee committed another serious infraction after he made the report). Here, the record is not clear that Defendants terminated Carman for violating company rules. As explained in the following discussion, a genuine fact dispute exists on that issue.

Having found a genuine fact dispute on whether Carman's protected activity was a contributing factor in his termination,

15

the Court turns to Defendants' argument that Carman would have been terminated for his June 30 post even if he had not engaged in protected activity.  Defendants contend that Brockman had a good faith, honest belief that Carman violated Rule 900 by threatening to disrupt Defendants' operations, and they argue that the Court must accept Brockman's statement on this point as true.  In support of this argument, Defendants cite *Stone & Webster Construction, Inc. v. U.S. Department of Labor*, 684 F.3d 1127, 1132–33 (11th Cir. 2012), a case involving a whistleblower complaint under the Energy Reorganization Act.  The precise question for the Eleventh Circuit in *Stone & Webster* was whether the Department of Labor's Administrative Review Board, which was obligated to review an administrative law judge's decision for substantial evidence, erred when it discredited the ALJ's findings of fact and substituted its own.  Since the "substantial evidence standard limits the reviewing court from 'deciding the facts anew, making credibility determinations, or re-weighing the evidence,'" the review board erred when it "disregarded the ALJ's conclusions supported by substantial evidence in the record," including the ALJ's credibility determination regarding the decisionmaker's reason for discharging the employee.  *Id.* at 1133, 1136 (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam)).

16

Here, in contrast, the relevant question is whether there is a genuine fact dispute on whether Brockman held a good faith, honest belief that Carman violated Rule 900. A reasonable juror could conclude that Brockman did not actually believe that Carman's June 30 statement in a comment thread among friends on Facebook was a true threat against the railroad. Brockman himself described the comment as an "idle threat," and the record viewed in the light most favorable to Carman would permit a juror to conclude, based on all the other comments and what actually happened after the June 30 Facebook post, that Brockman understood by the time of his investigation that Carman did not intend to refuse crew calls when he was needed at the railroad.[4] Based on this genuine fact dispute, summary judgment is inappropriate.

## CONCLUSION

For the reasons set forth above, the Court denies Defendants' partial summary judgment motion (ECF No. 29).

IT IS SO ORDERED, this 7th day of August, 2020.

> s/Clay D. Land
> CLAY D. LAND
> U.S. DISTRICT COURT JUDGE
> MIDDLE DISTRICT OF GEORGIA

---

[4] A reasonable juror could also conclude that Brockman honestly believed that Carman did make a true threat to disrupt Defendants' operations, but at this stage in the litigation the Court must view the evidence in the light most favorable to Carman.

17